IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GABRIEL G. RAMIREZ,

                      Plaintiff,                      OPINION AND ORDER

v.

                                                    15-cv-365-wmc

SHERIFF OF DANE COUNTY, *et al.*,

                      Defendants.

*Pro se* plaintiff Gabriel G. Ramirez claims that on November 12, 2014, Dane County Jail Deputies L. Kranski, Sween, and Jane and John Doe used excessive force claim against him in violation of the Fourteenth Amendment. Defendants filed a motion for summary judgment (dkt. #30), as well as a motion to dismiss the Doe defendants (dkt. #47). In response, plaintiff filed opposition materials, along with a renewed motion for assistance in recruiting counsel (dkt. #46). Part of of Ramirez's opposition was that he had not been allowed to review the surveillance video footage of the incident, prompting the court to defer ruling until completing its own *in camera* inspection of the video footage. (Dkt. #59.) *See Piggie v. Cotton*, 344 F.3d 674, 679 (7th Cir. 2003) (acknowledging that precluding a prisoner from reviewing surveillance footage may be appropriate in certain circumstances, but a "blanket policy of keeping confidential security camera videotapes for safety reasons" is insufficient). After defendants provided a copy of the video footage to the court, Ramirez filed another motion opposing defendants' motions. (Dkt. #62.)

Having reviewed the video footage and the parties' additional arguments, the court will: (1) grant defendants' motion to dismiss but deny their motion for summary judgment; (2) allow Ramirez the opportunity to review the video footage before trial; and

1

(3) conduct a telephonic status conference to evaluate whether it should grant Ramirez's motion for assistance in recruiting counsel. If the court declines to recruit counsel on behalf of Mr. Ramirez, the court will re-set the trial schedule during that teleconference.

UNDISPUTED FACTS[1]

A. Background

Gabriel Ramirez arrived at the Dane County Jail on November 11, 2014, on a writ from Fox Lake Correctional Institution ("FLCI") to appear at the Dane County Courthouse in a criminal matter. Defendants are Dane County Deputy Sheriffs Kranski, Sween, Jane Doe and John Doe, all of whom were assigned to the Dane County Jail on the morning of November 12, 2014.

Among other policies, the Dane County Jail Inmate Handbook requires prisoners to follow all jail rules, follow staff directives, and avoid disorderly conduct. It likewise prohibits prisoners from threatening or harassing staff or other inmates. Directly relevant here, prisoners must present in full jail uniform for all standing headcounts, show themselves for headcounts, and wear their jail-issued uniform and footwear whenever they are out of their cell or bunk.

---

[1] The court has drawn the following facts from the parties' proposed findings of fact, responses, and underlying evidence submitted in support. While Ramirez submitted his declaration and proposed findings of fact after his deadline to respond to defendants' motion for summary judgment, and then later submitted subsequent materials that he claims are relevant to his opposition materials, the court has considered them for purposes of summary judgment given his *pro se* status.

After Ramirez was booked into the jail on November 11, he received a copy of the Inmate Handbook that outlined the policies and procedures of the Dane County Jail, and he admits that he was also familiar with these policies because he had already done time at that jail in the past. When Ramirez arrived for booking, he was wearing his FLCI uniform, but received a Dane County Jail uniform, although he did not put it on at that time.

Jail staff conduct a prisoner count at designated times during the day or following incidents with security concerns. The morning head count generally took place in Ramirez's unit at approximately 5:00 a.m. Prisoners received ten-minute and five-minute warnings prior to the head count, as well as a final announcement over the intercom. During the final announcement, prisoners are again instructed to be standing in front of their bunks for head count *and* to be in their full jail uniform, which consists of a jail-issued blue shirt, blue pants and sandals, without any towels or headwear.

B. The Incident

Consistent with this general procedure, on November 12, 2014, the lights were turned on in Ramirez's unit at approximately 4:40 a.m. by Deputy Wollenzien, who was preparing to conduct the morning head count. When giving the five-minute warning, Wollenzien noticed that all of the inmates were standing and wearing jail uniforms, except for Ramirez. He was wearing a brown shirt. According to Ramirez, Wollenzien started yelling at him, and Ramirez says that he was confused and disoriented, which is why he failed to comply with Wollenzien's directive to change into his blue shirt. For his part, Wollenzien claims that he simply asked Ramirez to put on his blue shirt. Regardless,

3

Ramirez did not comply, and Wollenzien told Ramirez a second time to put on the blue shirt.

At that point, Ramirez claims to have asked why he needed to change since he was going to lay down after the head count. For a third time Wollenzien directed Ramirez to put on his blue shirt. After refusing to comply, Ramirez then told Wollenzien that he did not like the way he was speaking to him. During his deposition, Ramirez agreed that he was in violation of jail policy at that point, but also testified that he acted this way because he was still disoriented.

Wollenzien then radioed for a Movement Team to take Ramirez to segregation. After Wollenzien made the call, however, he saw on a monitor that Ramirez had complied with his directive and put on a blue shirt. Still, two Movement Teams responded to Wollenzien's request, consisting of deputies Sween, Kranski, Brian Riley, and Michael Haure. According to defendants, Deputies Sween and Kranski saw Wollenzien telling Ramirez that if his disruptive behavior continued, he would be sent to segregation, and that Ramirez responded with a "thousand-yard stare," which they interpreted as threatening. In contrast, Ramirez claims Wollenzien threatened him, and he responded in a respectful tone, "you didn't have to talk to me like that, I'm not an animal."

At that point, Sween, Kranski, Riley and Haure entered Ramirez's cell as a team to take him to segregation. Now seated on the lower bunk, Ramirez refused to stand, requiring team members to bring him to his feet. According to defendants, Ramirez was agitated and tensing his muscles, which prompted one deputy to hold Ramirez against a

4

wall to handcuff him. Ramirez describes this first contact differently: they "violently slammed him face first into a brick wall," in a way that caused him immense pain.

Next, defendants claim that because they were unable to handcuff Ramirez, Sween attempted to grab Ramirez's right arm multiple times, but Ramirez kept pulling his hand away from Sween and across his face and body. Defendants further claim that Ramirez attempted to turn toward two other deputies, at which point Sween yelled at him to stop resisting or they would use additional force against him, including a taser. Ramirez then pushed himself off the wall and claims he told the officers, "stop, it doesn't have to be like this. Stop."

After Haure hooked his arm around Ramirez's neck to free him from the wall and prevent Ramirez from punching the deputies, Ramirez claims that the other deputies started "punching, kneeing, kicking and hitting Ramirez everywhere - in his side, ribs, back, thighs, stomach, legs and other parts of his body." Defendant Sween describes his own actions as "three targeted knee strikes to Ramirez's side, abdominal, and hamstring." According to Ramirez, the deputies then pushed him into a corner, and continued to punch, knee, kick, and beat him.

For their part, defendants claim that Ramirez was still agitated, and he had moved to the corner of the room and grabbed the top bunk, which prompted Sween to strike Ramirez's forearm and torso to gain compliance, causing Ramirez to fall to the floor in front of the bunk with his arms tucked under his body. Even so, they claim Ramirez continued to struggle, and Sween struck Ramirez's thigh, back and side, all in an attempt to gain hold of Ramirez's right hand to place him in handcuffs. Ramirez denies that he

5

was still struggling, and claims instead that Sween and the other deputies were trying to cause him pain, including kicking, kneeing and punching his groin area.

Eventually, the deputies gained control of Ramirez on the floor. Sween held Ramirez's right leg, Kranski held his left leg and two other deputies held his upper body. Defendants claim that while handcuffing him behind his back, Ramirez flexed his upper body and yelled obscenities. Ramirez admits that he called the deputies "all kinds of names," but also claims that the deputies were pressing the handcuffs into his lower back and spine in a way that caused extreme pain. Ramirez also claims that Sween put his knee on his throat, and pressed down with his body weight in a way that made him choke and almost pass out. While this was happening, Ramirez heard another inmate yell, "Get off of him, you're choking him, he can't breathe." To which Sween purportedly responded, "Shut the Fuck up or you're next," although he did get off Ramirez's neck.

The deputies next put a spit hood on Ramirez, placing him in a restraint chair. When Ramirez was being placed in the chair, he began to lunge his upper body forward. Sween responded by pinning Ramirez's body to the chair, in what he describes as an effort to stop Ramirez from head-butting the deputies. Once stabilized, Ramirez was wheeled to segregation by the extraction team, during which defendants claim that he again lunged forward. According to Sween, he placed his hand on Ramirez's chin and pushed back, in an effort once again to stabilize Ramirez's head against the back of the restraint chair. Sween states that he held Ramirez that way for three seconds. Before he was placed in a segregation cell, a nurse also came to check on Ramirez, and she concluded that the restraints were placed on him properly.

As a result of these incidents, Ramirez suffered from cuts, bruises and rib pain, although his x-rays taken at the time were normal.[2] Ramirez nevertheless claims that while his injuries were not permanent, he had to increase his medications for ongoing mental health issues. He further claims that he started physical therapy for his rib injuries, that his mouth hurt when he talked or tried to eat after the incident, and that he suffered injury to his testicles and urinated blood for several days.

OPINION

I.  **Motion for Summary Judgment (dkt. #30)**

Plaintiff Ramirez claims that on November 12, 2014, Deputies Kranski and Sween, along with other unnamed "John/Jane Doe" defendants used excessive force against him in violation of his rights under the Fourteenth Amendment. Defendants seek summary judgment as to the Doe defendants because Ramirez never identified them,[3] and as to all of the defendants on the merits and on grounds of qualified immunity. While the court will dismiss the Doe defendants, various disputes of material fact preclude summary judgment as to Kranski and Sween.

---

[2] Defendants include additional proposed findings of fact related to Ramirez's subsequent disciplinary hearing and findings by jail personnel about the use of force. However, these findings are not material to the issues before this court, either at summary judgment or trial, since they are only supported by the factual and credibility determinations of jail employees, and therefore, inadmissible as evidence in these proceedings. On the contrary, their admission would, at worst, usurp the role of the trier of fact in this case, and at best, be irrelevant and unduly prejudicial.

[3] In addition to seeking summary judgment as to the Doe defendants, defendants filed a motion to dismiss them. (Dkt. #47.)

A.   **Doe Defendants**

The court granted plaintiff leave to proceed against Doe defendants based on allegations that multiple, other jail officials were involved in the use of excessive force on during the November 12 incident. Judge Crocker gave plaintiff two different deadlines to file an amended complaint identifying those defendants (May 12, 2017, and January 26, 2018), but he has never done so. (Dkts. ##27, 45.) More importantly, while plaintiff's filings suggest a continued *interest* in adding additional defendants, he has not justified his failure to meet the court's deadlines, beyond stating that he has had difficulty obtaining information from defendants. In particular, he has never asserted that defense counsel refused a direct request for the names of the other individuals involved in the incident.

Moreover, there has been no mystery as to the participants in the incident itself since shortly after its occurrence in 2014, given that the incident report prepared shortly after lists *six* responding officers (Wollenzien, Riley, Michael Haure, Sween, Kranski, Ryan Brandon, and Melissa Wiedenfeld). Nevertheless, plaintiff never named as a defendant anyone except Sween and Kranski, and cryptically indicating that he would like to proceed against a total of *five* different Doe defendants without ever attempting to identify any. (*See* Ex. 5 (dkt. #37-5) at 1; Ramirez Dep. (dkt. #34) at 57-58.) Given Ramirez's unclear intentions, as well as his repeated failure to follow the court's orders or pursue specific discovery, plaintiff has no excuse for still failing to actually name the additional Doe defendants.[4]

---

[4] In fairness, the inability to view video of the actual attacks might have justified some delay, but plaintiff's failure to take any meaningful steps to identify additional participants, by other means substantially weakens that assertion, especially after so long a time, repeated court orders and

Finally, this lawsuit has been proceeding since December of 2016, and Ramirez, as well as the prisoners that have been helping him, have been in regular contact with defense counsel since then. Still, even in his most recent filing, Ramirez does not make any effort to identify any of the Doe defendants, instead arguing generally that they should not be dismissed. Even taking into account his *pro se* status, allowing him to amend his complaint would unfairly prejudice defendants. *See Johnson v. Cypress Hill*, 641 F.3d 867, 871-72 (7th Cir. 2011) ("[district] courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendant, or where the amendment would be futile."); *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994) ("pro se litigants are not entitled to a general dispensation from the rules of procedure or court imposed deadlines"). Accordingly, at this juncture, dismissal of the Doe defendants is appropriate.

**B. Excessive Force**

Turning to defendants' merits-based argument, plaintiff has the burden to show "that the force purposely or knowingly used against him was objectively unreasonable," since he was a pretrial detainee on November 12, 2014. In deciding that question, the trier of fact may consider, among others, the following factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity

---

availability of other means of identification. Having said that, should review of the video justify the addition of a specific individual as a defendant, the court would at least consider that by formal motion.

of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).[5]

As an initial matter, the parties' respective descriptions and characterizations of the altercation are replete with disputes, and while defendants offer several justifications for the use of force, each argument construes the facts in their favor. First, defendants argue that Ramirez presented a safety threat because he failed to follow jail rules, and was defiant and argumentative in his cell. Yet plaintiff denies acting defiantly, and the parties do not dispute that Ramirez changed his blue shirt *before* the movement teams even entered the cell, meaning that at least on that point Ramirez had complied with the policy. While defendants argue that Ramirez's initial obstinance, followed by his claimed "thousand yard stare" posed a sufficient security threat to justify the cell extraction, plaintiff again maintains that he was not acting in a confrontational manner and that he responded calmly to Wollenzien's threats. In any event, if the jury accepts that defendants more likely than not recognized that Ramirez was simply groggy and slow in compliance, rather than openly and continuously defiant, it may reasonably conclude that it was no longer necessary to extract Ramirez once he complied with the order to put his blue shirt on.

Second, while plaintiff admits that he refused to stand when Sween, Kranski, Riley and Haure entered the cell, defendants argue that they only pressed him against the wall because he was agitated and tensing his muscles. Plaintiff maintains that neither assertion is true, and the defendants *unnecessarily* and *violently* slammed him against the wall. This

---

[5] While defendants point out that that there is some question about whether the Eighth or Fourteenth Amendment governs Ramirez's claims, their arguments assume an analysis under the standard set forth in *Kingsley*.

highlights a second factual dispute that a jury will have to resolve: did Ramirez's physical response render the force used by the defendants objectively unreasonable.

Third, defendants contend, more broadly, that their continued use of force was necessary to temper the "large-scale security risk" Ramirez had caused at the jail, pointing out that he was actively resisting and yelling obscenities in the presence of several other inmates. Certainly, defendants have a legitimate interest in setting the example that non-compliance will not be tolerated, but that argument also assumes that Ramirez was acting defiantly, which plaintiff once again disputes, and that the original use of force was not objectively unreasonable given the threat Ramirez posed in that moment, which Ramirez likewise disputes.

Fourth, defendants characterize each of their techniques as appropriate attempts to regain control over Ramirez. Specifically, they argue that Sween's strikes were intended to obtain Ramirez's compliance when he flailed his arms and pushed himself off the wall. Additionally, they argue that Kranski was only involved insofar as she held down Ramirez's leg when he was on the floor. Unfortunately, defendants' characterization of Sween's and Kranski's actions as clinical and objective stand in stark contrast to Ramirez's version: he was violently and repeatedly hit, punched and kicked, even though he was not resisting; and the video does not adequately preclude his characterization from being accepted by the trier of fact. Thus, another factual dispute remains for a jury to resolve.

Fifth and finally, defendants argue that Ramirez's injuries were minimal. Yet to succeed on his claim of injury at summary judgment, plaintiff was not obligated to put forth more than some evidence of injury. Ramirez has insisted that he urinated blood for

11

days and had to increase his mental health medications as a result of this incident, and in any event, Ramirez's injury is just one of the factors for consideration in the ultimate conclusion about the reasonableness of the force used. Ultimately, if a jury were to believe plaintiff's version of events, it *might* reasonably conclude that there was no need for the defendants' use of force, or at least the amount of force, under all the circumstances here, and that the force defendants eventually used went beyond what was required here. *See, e.g., Hill v. Shelander*, 992 F.2d 714, 717 (7th Cir. 1993) ("If the fact-finder were to accept [plaintiff's] story, then [defendant] arguably acted without justification because there would have been no need for [defendant] to physically assault [plaintiff] in order to maintain or restore discipline in the cell.").

### C. Qualified Immunity

Finally, defendants argue that they are entitled to qualified immunity on plaintiff's excessive force claim. Qualified immunity applies whenever a government official's actions, even if unconstitutional, did not violate "clearly established law" at the time. *Pearson v. Callahan*, 555 U.S. 223, 243 (2009); *Vinning–El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011). While plaintiff has cited no cases showing that "clearly established" law prohibited the use of force, the disputed facts preclude a judgment on this basis.

Here, the facts surrounding the incident are in dispute. When those facts are construed in the light most favorable to plaintiff, a reasonable correctional officer may be found to have been put on notice at the time of the occurrence that plaintiff's conduct did not justify the sort of force described in his account. At minimum, the court is unable to decide otherwise without a full examination of the evidence at trial. *Estate of Heenan ex.*

12

*Rel. v. City of Madison*, 111 F. Supp. 929, 948 (W.D. Wis. 2015). Accordingly, defendants' motion for summary judgment fails as a matter of law, and this case shall proceed to trial.

   D. Video Footage

Along with a copy of the video surveillance capturing the incident on November 12, 2014, defendants submitted a brief arguing: (1) the footage is relevant, although not dispositive; and (2) security concerns outweigh Ramirez's interest in reviewing the video. As for relevance, defendants argue that the footage does not capture the entirety of the incident in question. Certainly, the video footage does not resolve many of the material factual disputes for purposes of summary judgment, *Scott v. Harris*, 550 U.S. 372, 381 (2007) ("When opposing parties tell two different stories, one of which is blantantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). However, it does capture the majority of the material events, including the defendants' entrance into Ramirez's cell, their ensuing altercation with Ramirez and his placement in a restraint chair. Even without audio and only one angle of the incident, the video is certainly relevant to Ramirez's claims. Of course, both sides are free to argue the extent of the video's relevance and to fill in any arguable blanks with witness testimony.

As for defendants' claim that the risks of disclosing this video footage to defendant outweighs his interest in viewing it, defendants submit an affidavit from Sergeant Timothy Elve, who describes Dane County Jail's specific security concerns. (Dkt. #60-1.) According to Sergeant Elve, the surveillance video contains images of secure areas of the Dane County Jail processes and procedures, including the location of cameras and censors,

depictions of staffing operations, various law enforcement techniques and information about physical safety measures employed by the Dane County Jail. Elve avers that if this information were made public, it could compromise or weaken security measures used at the jail.[6]

Even crediting defendants' security concerns regarding disclosing, the footage is now over four years old, and Elve's affidavit is not sufficiently specific to preclude Ramirez from viewing it, particularly since he is no longer incarcerated at the jail. Furthermore, steps can be taken to allow Ramirez access to the video without allowing public disclosure. Finally, defendants have not shown that inmates do not already have basic knowledge of the layout of the jail, the placement of censors, or jail extraction protocols, such that disclosure is likely to create an increased security risk. Accordingly, defendants must make arrangements for Ramirez to view the video footage in question and make notes. Defense counsel will be required to coordinate with FLCI personnel and, if applicable, Ramirez's counsel, to arrange for a viewing of the video footage. Deadlines for those viewings should be built into the revised trial schedule.

### III.  Motion for Assistance in Recruiting Counsel (dkt. #46)

Through a jailhouse lawyer, *pro se* plaintiff Ramirez represents that: he cannot afford to hire counsel; he suffers from a number of mental illnesses, including bipolar disorder, depression, and anxiety; and he has been relying on another inmate to help him with his

---

[6] Elve also opines that the interest in maintaining building security outweighs the benefit it would provide Ramirez, but the balancing of Ramirez's interests obviously exceeds his expertise.

filings.[7] Unfortunately, the starting point with respect to any *pro se* plaintiff's request for counsel is that there is no such right in civil cases. *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014). Rather, courts have discretion to grant motions for assistance in recruiting counsel where a party meets several requirements. *Santiago v. Walls*, 599 F.3d 749, 760-61 (7th Cir. 2010). Ramirez has already established both that he is unable to afford counsel *and* he has made reasonable efforts to find a lawyer on his own without success, so the question is whether the legal and factual difficulty of the case exceeds his ability to prosecute it, *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007).

This lawsuit is about whether the defendants used excessive force against him on November 12, 2014. As explained above, Ramirez's burden at trial will include submitting evidence about the incident in question -- which will involve his own and other witnesses' memories of the incident, along with (perhaps) narratives of what one witness believes the video footage of the incident reveals -- and argument about the relevance of *Kingsley* factors. Even though these obligations are relatively straightforward, the court cannot conclude on this record whether Ramirez is up to the task.

Since *all* of Ramirez's filings to date appear to have been prepared by other prisoners, they offer little guidance as to whether this lawsuit's demands exceed *Ramirez's* abilities. *See Walker v. Price*, 900 F.3d 933, 938-41 (7th Cir. 2018) (district court abused

---

[7] Perhaps relatedly, plaintiff complains that the court's orders setting a deadline to amend his complaint to add the Doe defendants were unclear. In fact, Judge Crocker did advise Ramirez that adding a new claim altogether (a retaliation claim) was an uphill battle, but *separately* advised him that amending his complaint to add the Doe defendants was quite straightforward. (*See* Order (dkt. #45) at 2 n.1, 5-6.) Even if this seemingly straightforward directive left questions in plaintiff's mind as to his obligations, he has still not provided any basis for the court to conclude that any of the so-called Doe defendants should remain a part of this lawsuit.

its discretion in relying on pre-trial filings prepared with the help of another prisoner, thereby failing to consider *pro se* plaintiff's mental and psychological limitations, in denying a request for counsel leading up to a jury trial that would take place primarily via videoconference); *Robinson v. Scrogum*, 876 F.3d 923, 925 (7th Cir. 2017) (citing *Henderson v. Ghosh*, 755 F.3d 559, 565 (7th Cir. 2014)).

The court also attempted to obtain an accurate read on Ramirez's abilities by reviewing the transcript of his deposition, and while that material provides some insight, the court still has unresolved questions. (Dkt. #34.) For example, Ramirez testified that he takes six different medications to treat his mental health issues, including Post-Traumatic Stress Disorder, panic and anxiety, schizophrenia, and agoraphobia. Despite these mental health challenges, however, the deposition transcript suggests that Ramirez is articulate, understood the majority of the questions posed, and remembered the details of the November 12, 2014, incident quite well. Furthermore, his answers were very specific and suggested that he understood the relevant legal standard in play. In particular, even though acknowledging that he may have resisted, Ramirez also maintained that the *extent* of defendants' force went too far, at least in his view. Accordingly, Ramirez's testimony would suggest that he has the ability to prepare an opening statement, elicit testimony and cross examine witness, as well as to present the video footage to the jury in an effective manner.

That said, while Ramirez appears both literate and well-spoken, having testified about researching his claims in this lawsuit, as well as reading information at the jail, the court cannot conclude with any confidence that he will be able to review and respond to

written materials not received until trial. Since it is impossible to determine on this record whether the requirements of this case exceed Ramirez's abilities, the court will hold a telephonic conference with the parties, so that the court can walk Ramirez through the requirements of his case and assess whether to grant his request for assistance in recruiting counsel.

ORDER

IT IS ORDERED that:

(1) Defendants' motion to dismiss the John/Jane Doe defendants (dkt. #47) is GRANTED.

(2) Defendants' motion for summary judgment (dkt. #30) is GRANTED in part and DENIED in part as set forth above.

(3) Plaintiff's motion to supplement (dkt. #62) is GRANTED as set forth above.

(4) The court RESERVES on plaintiff's motion for assistance in recruiting counsel (dkt. #46) as a telephonic conference is scheduled for **April 2, 2019, at 10:30 a.m.** Defense counsel is responsible for initiating the call to chambers, at (608) 264-5087.

Entered this 19th day of March, 2019.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge